MARC PENBERG,

                    Plaintiff,                          **MEMORANDUM**
                                                        **AND ORDER**
            - against -

                                                        08 CV 1534 (CLP)
HEALTHBRIDGE MANAGEMENT,

                    Defendant.
------------------------------------------------------X

On April 14, 2008, plaintiff Marc Penberg commenced this action against HealthBridge

Management, LLC ("HealthBridge"), alleging that he had been wrongfully terminated from his

employment based on disability and age discrimination, in violation of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 1210 et seq., the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. §§ 621 et seq., and subjected to retaliation in violation of the ADA, the

ADEA, the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 112601 et seq., the New York

State Human Rights Law ("NYSHRL") §§ 296 et seq., the New York City Human Rights Law

("NYCHRL") §§ 8-101 et seq., and the Massachusetts Fair Employment Act ("MFEA").

(Compl.[1] ¶ 1).

Presently before the Court are the defendant's Motion for Summary Judgment on all

remaining claims in the Complaint[2] and plaintiff's Cross-Motion for Summary Judgment on the

---

[1]Citations to "Compl." refer to plaintiff's First Amended and Supplemental Complaint, filed December 14, 2010.

[2]In footnote 1 of Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl.'s Opp."), plaintiff "dismisses his claims under the New York City Human Rights Law, the Americans with Disabilities Act, and his disability discrimination claim under the Massachusetts Fair Employment Act." (Pl.'s Opp. at 1). Therefore, the Court has not addressed these abandoned claims any further.

defendant's counterclaims. For the reasons set forth below, defendant's motion is granted in part, and denied in part; plaintiff's motion is denied.

## FACTUAL BACKGROUND

Defendant HealthBridge manages skilled nursing and rehabilitation facilities, including certain facilities in Massachusetts for neuro-rehabilitation. (Def.'s 56.1 Stmnt[3] ¶¶ 1, 2; Pl.'s Resp.[4] ¶¶ 1, 2). From 2003 to 2007, plaintiff Marc Penberg was employed by defendant as director of marketing and supervisor of a marketing team seeking to place patients in these Massachusetts facilities. (Compl. ¶ 6; Def.'s 56.1 Stmnt ¶¶ 2, 3, 16; Pl.'s Resp. ¶ 3). Plaintiff was born in December 1954 and was 53 years old at the time his position was eliminated. (Def.'s 56.1 Stmnt ¶ 34; Pl.'s Resp. ¶ 34).

Among other responsibilities, plaintiff supervised three liaisons, Cecilia Perdito, Nancy Casso, and Margaret Vaughn (collectively, the "New York liaisons"), who were each responsible for their own territory in New York. (Def.'s 56.1 Stmnt ¶¶ 6, 7; Pl.'s Resp. ¶ 6). In addition to supervising the New York liaisons, plaintiff had his own territory, consisting of Brooklyn, Queens, Westchester, Putnam, Orange, Rockland, Dutchess, and Sullivan Counties, where he was responsible for identifying patient referrals for placement at HealthBridge's neuro-rehabilitation facility in Massachusetts. (Def.'s 56.1 Stmnt ¶¶ 6, 8; Pl.'s Resp. ¶ 8). Plaintiff

[3]Citations to "Def.'s 56.1 Stmnt" refer to Defendant HealthBridge Management's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a), dated March 7, 2011.

[4]Citations to "Pl.'s Resp." refer to Plaintiff's Corrected Response to Defendant's 56.1 Statement, dated May 12, 2011.

2

worked out of his home located in Shirley, New York, traveling in his New York territory and making day trips to Massachusetts once or twice a year. (Def.'s 56.1 Stmnt ¶¶ 4, 5; Pl.'s Resp. ¶¶ 4, 5).

As a necessary step in converting a patient referral to an admission, the HealthBridge employees were required to conduct a clinical screening of the referred individual, including an evaluation of the individual's medical and behavioral history to determine whether the person's needs could be met by the facility. (Def.'s 56.1 Stmnt ¶¶ 12, 14; Pl.'s Resp. ¶¶ 12, 14). Defendant contends that the three New York liaisons each had a clinical background: Perdito is a Registered Nurse; Casso is a Licensed Practical Nurse; and Vaughn is a Social Worker. (Def.'s 56.1 Stmnt ¶ 9). Plaintiff disputes the degrees as described and disagrees that the degree descriptions were equal to a "clinical background." (Pl.'s Resp. ¶ 9). According to defendant, normally the person who obtains the referral would conduct the clinical screening. (Def.'s 56.1 Stmnt ¶ 13). Plaintiff admits that this was the "usual practice" but contends that there was "no formal procedure requiring this." (Pl.'s Resp. ¶ 13). However, because plaintiff was not a nurse or social worker and had no licenses or certifications, defendant claims that Ms. Perdito conducted the majority of screenings for plaintiff's referrals. (Def.'s 56.1 Stmnt ¶¶ 10, 11, 15). Although plaintiff concedes that he had no certificates or licenses, he had a Masters Degree in counseling, and he claims that he did his own screenings in the last few years before being laid off. (Pl.'s Resp. ¶¶ 11, 15).

In or about August 2007, HealthBridge asked various departments, including marketing, finance, operations, and construction and development, to evaluate their staffing needs in a

3

"company-wide effort to reduce costs and streamline personnel." (Def.'s 56.1 Stmnt ¶¶ 17, 19;
Pl.'s Resp. ¶¶ 17, 19). According to defendant, Ms. Leja, Vice President of Marketing for New
England, was asked to identify an employee from her department to be included in the reduction
in force, and she identified plaintiff as a candidate for termination. (Def.'s 56.1 Stmnt ¶¶ 17, 18).
Plaintiff contends that Ms. Leja originally did not provide any recommended names for layoff,
but when pressed by Seth Gribetz, Chief Operating Officer of HealthBridge, she suggested that
plaintiff be laid off. (Pl.'s Resp. ¶¶ 17, 18). According to defendant, plaintiff was selected for
the layoff due to his lack of clinical skills, and the inefficiencies that resulted due to the need to
have Ms. Perdito conduct plaintiff's evaluations. (Def.'s 56.1 Stmnt ¶¶ 21, 22, 24, 26).

Plaintiff concedes that other departments were asked to evaluate their personnel in
connection with the reduction in force (Pl.'s Resp. ¶ 19; see also Def.'s 56.1 Stmnt ¶ 19), but
denies that he was laid off "due to his lack of a clinical license[] and qualifications in regards to
the screening of potential patients. . . ." (Pl.'s Resp. ¶¶ 21, 22; Def.'s 56.1 Stmnt ¶¶ 21, 22).
Plaintiff argues that HealthBridge's stated reasons for discharging him are pretextual. Plaintiff
contends that he was laid off "because of his disabilities, because of the perception that his
disabilities might cause additional absences, because he had exercised his right to a 12-week
medical leave, and because of his age." (Compl. ¶ 14). Plaintiff contends that he always
received excellent evaluations and brought in a greater percentage of patients during the years
2003, 2004, and 2007. (Pl.'s Opp.[5] at 4; Ex. F at 61). He further contends that the lack of

---

[5]Citations to "Pl.'s Opp." refer to Plaintiff's Memorandum of Law in Opposition to
Motion for Summary Judgment, dated May 18, 2011.

4

clinical licenses and qualifications is "a pretextual reason created after the lawsuit was filed."
(Id. ¶ 22). Plaintiff further contends that despite his lack of a medical degree, he was "the top
performer in the New York Sales Group." (Id. ¶ 24). Although defendant claims that
HealthBridge eliminated employees under the age of 40 and continued to employ Directors of
Marketing over the age of 50 (Def.'s 56.1 Stmnt ¶¶ 35, 36), plaintiff notes that actually only one
Director was over 50; indeed, according to the records, a "very large percentage of those laid off
were over 50 years of age." (Id. ¶¶ 22, 37).

On August 15, 2007, Ms. Leja and Lisa Crutchfield, Vice President of Human Resources,
advised plaintiff of the reduction in force, and sent him a Separation Agreement and General
Release. (Def.'s 56.1 Stmnt ¶¶ 27, 28; Pl.'s Resp. ¶¶ 27, 28). According to defendant, on August
18, 2007, plaintiff acknowledged reading the Separation Agreement, but demanded more
severance pay. (Def.'s 56.1 Stmnt ¶ 29). Plaintiff denies that he read the entire Separation
Agreement. (Pl.'s Resp. ¶ 29).

Following the elimination of plaintiff's position, Ms. Leja initially supervised the New
York liaisons until that responsibility was taken over by Lynne Fenuccio, a Registered Nurse and
Regional Director of Neurorehabilitation Services. (Def.'s 56.1 Stmnt ¶ 30; Pl.'s Resp. ¶ 30).
Ms. Perdito undertook the responsibility of marketing in plaintiff's former territories. (Def.'s
56.1 Stmnt ¶ 32; Pl.'s Resp. ¶ 32).

With respect to plaintiff's diabetic condition, it is undisputed that plaintiff was required to
test his blood on occasion, but defendant claims that plaintiff never requested an accommodation
and never missed time from work due to the condition. (Def.'s 56.1 Stmnt ¶¶ 41, 42; Pl.'s Resp.

5

¶¶ 41, 42). On August 15, 2006, plaintiff told Ms. Leja that he was going on vacation, but that they needed to schedule his annual review when he returned. (Def.'s 56.1 Stmnt ¶¶ 46, 42; Pl.'s Resp. ¶ 46). Although the review was scheduled for September 15, 2006, Ms. Leja had to cancel; thereafter, on September 13, 2006, plaintiff notified defendant that he was going to need heart surgery and requested leave, which was granted beginning on September 19, 2006. (Def.'s 56.1 Stmnt ¶¶ 46-49; Pl.'s Resp. ¶¶ 46-49). On November 20, 2006, plaintiff returned to work in the same position with no change in duties or salary. (Def.'s 56.1 Stmnt ¶ 50; Pl.'s Resp. ¶ 50). However, as plaintiff notes, he never received his evaluation, nor did he receive a pay increase as a result. (Pl.'s Resp. ¶ 50). Defendant contends that plaintiff never told anyone that he felt he was not getting his evaluation because of his health condition. (Def.'s 56.1 Stmnt ¶¶ 43, 45; Pl.'s Resp. ¶¶ 43, 45).

In this action, plaintiff alleges that he was discriminated against because of his age and terminated because he was over 50 years of age, in violation of the ADEA. He also claims that he is diabetic and was discriminated against based on his disabilities, which caused HealthBridge to believe that he might require additional absences.[6] The Court notes that while plaintiff initially brought claims under the ADA, the NYCHRL, and the MFEA, plaintiff has since abandoned those claims.[7] Therefore, the Court addresses only plaintiff's remaining claims, under

---

[6] Plaintiff also alleges claims of retaliation based on HealthBridge's assertion of a breach of fiduciary claim and request for spoliation sanctions, which were addressed by this Court in a prior Order, dated October 19, 2010. Plaintiff has cross-moved for summary judgment on defendant's breach of fiduciary duty claim. Since this claim is based on events occurring after the commencement of the litigation, the facts and circumstances leading up to this claim are set forth below at 25-28.

[7] See n.2 supra.

the ADEA, the FMLA, and the NYSHRL.


## DISCUSSION

### I. Summary Judgment Standards

It is well-settled that a party moving for summary judgment has the burden of establishing

that there is no genuine issue of material fact in dispute and that the moving party is entitled to

judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary

judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case

to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976);

Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary

judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant

summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains

for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and

citations omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn

from the underlying facts . . . must be viewed in the light most favorable to the party opposing

the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88

(1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Richardson v.

New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen

considering a motion for summary judgment the court must draw all factual inferences and

resolve all ambiguities in favor of the nonmoving party").

7

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted).

I. Plaintiff's Discrimination Claims[8]

A. Plaintiff's Claims of Age Discrimination

Plaintiff has alleged that he was subjected to age discrimination under the ADEA because out of the four New York representatives, plaintiff, the top performer and the only individual over 50 years of age, was the one terminated. (Pl.'s Opp. at 11). Defendant moves for summary judgment on plaintiff's ADEA claim on the grounds that plaintiff cannot establish that HealthBridge's legitimate reasons for his termination were a pretext for discrimination. (Def.'s

---

[8]Although defendant also moves for summary judgment on plaintiff's retaliation claim, that motion is addressed in connection with plaintiff's motion for summary judgment on the counterclaim. (See discussion infra at 40-46).

8

Mem.[9] at 20).

1) Standards

The ADEA prohibits an employer from refusing to hire, discharging, or otherwise

discriminating against an employee based on age. 29 U.S.C. § 623(a)(1); see Boyle v. McCann-

Erickson, Inc., 949 F. Supp. 1095, 1099 (S.D.N.Y. 1997). Under the ADEA, an employee has

the burden of showing that age was either a "significant contributing factor" in the employer's

decision, Lowe v. Commack Union Free School Dist., 886 F.2d 1364, 1375-76 (2d Cir. 1989),

cert. denied, 494 U.S. 1026 (1990), or that it was "a determinative factor considered by the

employer" in making an adverse employment decision. Boyle v. McCann-Erickson, Inc., 949 F.

Supp. at 1099 (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).

In analyzing a claim of race or age discrimination under the ADEA, courts employ the

burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. at 802-03, and

its progeny. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001), cert.

denied, 534 U.S. 951 (2001). Thus, the plaintiff in a suit brought under the ADEA bears the

initial burden of proving a prima facie case of discrimination by a preponderance of the evidence.

See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (citing Texas Dep't of Cmty.

Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)); Slattery v. Swiss Reinsurance America Corp.,

248 F.3d at 94. Once a plaintiff has established a prima facie case of age discrimination, the

burden then shifts to the employer to establish a non-discriminatory reason for the employment

---

[9]Citations to "Def.'s Mem." refer to Defendant HealthBridge's Memorandum of Law in Support of its Motion for Summary Judgement, filed March 8, 2011.

9

decision. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 252-53. The final burden is then placed back on the plaintiff to prove that the defendant's proffered reason was pretextual and that defendant discriminated against the plaintiff. Id. at 253; Slattery v. Swiss Reinsurance America Corp., 248 F.3d at 95; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

Generally, to establish a prima facie case of age discrimination, a plaintiff must show that he was (1) a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; (4) under circumstances giving rise to an inference of discrimination based on membership in the protected class. Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000), cert. denied, 530 U.S. 1261 (2000); Chambers v. TRM Copy Ctrs.Corp., 43 F.3d 29, 37 (2d Cir. 1994); accord McDonnell Douglas Corp. v. Green, 411 U.S. at 802 (explaining that a prima facie case is made out under Title VII "by showing (i) that [plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications"). Courts analyze "ADEA claims within the same framework as Title VII," Guerra v. Jones, No. 08 CV 0028, 2010 WL 986403, at *7 (N.D.N.Y. Mar. 17, 2010) (citations omitted), with the only difference being that the protected group is based on age as opposed to race. See McDonnell Douglas Corp. v. Green, 411 U.S. at 802. The requirements for establishing such a prima facie case, however, are "minimal," St. Mary's Honor

10

Ctr. v. Hicks, 509 U.S. at 506; accord Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998), and courts in this circuit have held that "the Supreme Court intended the lower courts to be flexible in determining what prima facie elements should be utilized." Cifra v. Gen. Elec. Co., 62 F. Supp. 2d 740, 743 n.2 (N.D.N.Y. 1999), aff'd in part and vacated in part on different grounds, 252 F.3d 205 (2d Cir. 2001).

### 2) Analysis

In support of his prima facie case, plaintiff has offered evidence that at the age of 53, he was a member of a protected class of individuals over the age of 50 (Def.'s 56.1 Stmnt ¶ 34; Pl.'s Resp. ¶ 34); and that he was qualified for the position which he had held with defendant for roughly five years, during which time he had received excellent reviews. (Pl.'s Opp. at 2-3). Plaintiff's termination from his position in 2007 clearly constitutes an adverse employment action. Plaintiff argues that in light of the fact that he was a "top performer" among sales representatives, the only sales representative over 50, and the only sales representative terminated, his termination gives rise to an inference of age discrimination. (Id. at 11). Defendant does not argue that plaintiff cannot establish a prima facie case of age discrimination. Instead, defendant argues that it has offered a legitimate, non-discriminatory reason for plaintiff's termination which plaintiff is unable to demonstrate was a pretext for discrimination. (Def.'s Mem. at 20-21).

Once a plaintiff has made out a prima facie case of discrimination, defendant has the burden of proffering a legitimate non-discriminatory reason for plaintiff's termination. See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198

F.3d 68, 72 (2d Cir. 1999). This burden has been described as "light," Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998), and courts have held that the employer "need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." Id.; see also Cody v. County of Nassau, 577 F. Supp. 2d 623, 636 (E.D.N.Y. 2008)

Here, defendant contends that plaintiff's position was eliminated due to unrelated economic challenges and a desire to streamline HealthBridge's operations. (Def.'s Mem. at 22). Defendant further asserts that plaintiff's lack of a licensed clinical background and the resulting inefficiencies were the non-discriminatory basis for terminating plaintiff. (Id.) This articulated explanation satisfies the defendant's minimal burden of articulating a nondiscriminatory reason for the termination. Courts recognize economically-driven restructuring as a legitimate, nondiscriminatory reason for termination. See, e.g., Deebs v. Alston Transp. Inc., 346 Fed. Appx. 654 (2d Cir. 2009); Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001); Hroncich v. Paine Webber, Inc., 159 F.3d 134 (2d Cir. 1998).

Having proffered a legitimate rationale, it then falls once again to plaintiff to demonstrate that the legitimate reasons offered by the defendant were "merely a pretext for discrimination." Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d at 72. More specifically, plaintiff must show that discrimination "was a substantial reason for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). The burden for plaintiff is higher than that which applied for analyzing the prima facie case; a plaintiff must demonstrate "'a sufficient basis for a trier of fact to doubt the

12

persuasiveness of [the employer's] proffered evidence and ultimately to find that the [legitimate, non-discriminatory] reasons offered by [the employer] . . . were pretextual.'" Id. (quoting Quinn v. Green Tree Credit Corp., 159 F.3d at 770) (omission in original).

Clarifying the standard for examining claims of pretext in adverse employment actions, the Second Circuit stated:

> A plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the "impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation."

Holcomb v. Iona Coll., 521 F.3d 130, 142 (2d Cir. 2008) (quoting Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997)). In this case, plaintiff need not prove that the economic need to streamline operations played no role in his termination, only that his age was "a motivating factor" in his termination. Hyeck v. Field Support Servs., Inc., 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010) (holding that plaintiff "must present more than allegations that are 'conclusory and unsupported by evidence of any weight'") (quoting Smith v. American Express Co., 835 F.2d 151, 154 -55 (2d Cir. 1988)). However, it is well-settled that plaintiff must produce admissible evidence in support of his case. "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

Plaintiff argues that he has submitted sufficient facts to raise a question for trial. (Pl.'s Opp. at 14). Specifically, plaintiff contends that: 1) he was the top salesperson in New York, bringing in more patients, and converting a majority of his prospective individuals into actual

13

patients; 2) he performed better than two of his younger subordinates; and 3) he achieved these successes while also supervising three other people. (Id. at 14-15). He contends that there is an issue as to whether he could do his own assessments and argues that if he could, it does not make sense for Ms. Leja to have eliminated the top salesperson. (Id. at 15). He also points out that Ms. Leja was unaware that he had a Masters degree and did not know whether he did his own assessments. (Id.) Plaintiff further points out that when he was laid off, he was not told the reason now being advanced. (Id.) Instead, the Vice President of Human Resources made the following note: "January 20 back from [FMLA] leave, diabetic + 50." (Id.) Plaintiff suggests that these notes have gone unexplained. (Id.) Finally, plaintiff notes that 55% of those laid off were over 50, with only 35% remaining who were over 50. (Id. at 16).

Considering these facts, the Court finds that plaintiff has proffered sufficient evidence, which if proven, could be relied upon by a jury in finding that plaintiff's age was a motivating factor in his discharge. The note, with its reference to "+50," when considered in light of plaintiff's performance record and the fact that noone mentioned the issue of his credentials until suit was filed, raises enough questions about the defendant's proffered explanation to warrant a trial.

Accordingly, given that many of these facts are in dispute, the Court concludes that plaintiff has presented sufficient evidence to defeat defendant's summary judgment motion on the ADEA claim.

14

### B. Plaintiff's FMLA Claims

Defendant moves for summary judgment on plaintiff's FMLA claim of retaliation on the grounds that plaintiff cannot support his claim that he was terminated in retaliation for taking FMLA leave. (Def.'s Mem. at 24).

#### 1) Standards

The FMLA was enacted "to entitle employees to take reasonable leave for medical reasons . . . for the care of a child, spouse or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The Act provides job security for employees who have "serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). Under the Act, an employee is entitled to take a total of twelve workweeks of leave during any twelve month period, for health related reasons, 29 U.S.C. § 2612(a)(1)(D), and upon returning from such leave, the employee is entitled to be restored to his position or an equivalent position. 29 U.S.C. § 2614(a)(1). The FMLA prohibits an employer from interfering with an employee's exercise of his rights under the Act, 29 U.S.C. § 2615(a)(1), and from discharging or in any other manner discriminating against an individual for opposing any practice made unlawful by this subchapter. 29 U.S.C. § 2615(a)(2). Any eligible employee who was wrongfully denied benefits under the Act or who faced retaliation because of the exercise of her rights under the Act is authorized to bring a private action against the employer under the FMLA. See 29 U.S.C. §§ 2611, 2615; 29 C.F.R. § 825.220 (stating that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").

Plaintiff alleges two separate causes of action under the FMLA: 1) interference with the

15

exercise of his FMLA rights under 29 U.S.C. § 2615(a)(1), and 2) retaliation for exercising his FMLA rights. 29 U.S.C. § 2615(a)(2). (See Pl.'s Opp. at 12). The Court considers plaintiff's two claims in turn.

### a. Interference Claim

Interference claims are appropriate when "the employer in some manner impeded the employee's exercise of his or her right[s] afforded substantive protection under the FMLA." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 176 (2d Cir. 2006) (citing King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999)). A plaintiff bears the burden of establishing only a prima facie case for interference claims, and the court need not consider the issue of the employer's intent. Id. In order to establish a prima facie case of interference with plaintiff's exercise of FMLA rights, plaintiff must establish that: 1) he is an eligible employee; 2) defendant qualifies as an employer under the FMLA; 3) plaintiff was entitled to take leave under the FMLA; 4) plaintiff gave notice to defendants of his intention to take leave; and 5) defendants denied plaintiff the benefit to which he was entitled under the FMLA. See Brown v. Pension Bds., 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

### b. Retaliation Claim

In order to establish a prima facie case of retaliation under the FMLA, plaintiff must show that: 1) he exercised rights protected by the FMLA; 2) he was qualified for the position; and 3) he suffered an adverse employment action; 4) under circumstances giving rise to an inference of retaliatory intent. See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). In analyzing claims of retaliation under the FMLA, the Second Circuit has explicitly adopted the

16

McDonnell Douglas analysis used in Title VII cases. Id.; see also Aulicino v. N.Y. City Dept. Of Homeless Servs., 580 F.3d 73 (2d Cir. 2009); Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). For plaintiff to prevail on his claim that defendant terminated his position because of his need to take FMLA leave, he must show that he was terminated "under circumstances which give rise to an inference of unlawful discrimination." Aulicino v. N.Y. City Dept. of Homeless Servs., 580 F.3d at 80 (quoting Brown v. Coach Stores Inc. 163 F.3d 706, 710 (2d Cir. 1998)).

2) Analysis

For purposes of this motion, the parties do not appear to dispute that HealthBridge is a covered employer under 29 U.S.C. § 2611(4)(A)(i), or that plaintiff is an eligible employee as defined by the statute. Similarly, there does not appear to be a dispute as to whether plaintiff was entitled to take leave under FMLA, nor is there any claim that he failed to give notice to HealthBridge of his plan to take leave. (Pl.'s Opp. at 13). See Sixta v. CDC Ixix N. Amer., 445 F.3d 161, 167-68 (2d Cir. 2006). Moreover, since the FMLA is designed to protect employees who are temporarily unable to perform their job functions and specifically provides for intermittent leave, 29 C.F.R. § 825.203, plaintiff was eligible for FMLA leave. Id. If after taking FMLA medical leave, an employee is unable to return to work, there is, however, no obligation for an employer to keep the job open. See Roberts v. Ground Handling, Inc., 499 F. Supp. 2d 340, 351 (S.D.N.Y. 2007); see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 161 (2d Cir. 1999) (ruling that there was no FMLA violation where plaintiff was still unable to perform his job function at the conclusion of his FMLA leave period). Here, plaintiff was able to return to his job and functions after taking leave for his heart surgery; this does not preclude

17

his FMLA claims.

### a. Plaintiff's Interference Claim

Plaintiff argues that defendant violated 29 C.F.R. § 825.220(c), which prohibits consideration of FMLA leave as a negative factor in an employment decision. (Pl.'s Opp. at 13). He argues that every year in June, all HealthBridge employees received their evaluations and raises. (Id.) He contends that he was scheduled for an evaluation is September 2006 which was cancelled before he went out for heart surgery. (Id.) Even though he returned in November 2006, he was not evaluated again; he was never evaluated for the year 2006, nor did he receive his June evaluation for 2007. (Id.) Instead, he was terminated. (Id.) Ms. Leja testified in her deposition that she prepared evaluations for plaintiff for 2006 and 2007, but plaintiff never received a raise. (Id.) Since he claims he was the highest producer in New York for 2007, he argues that, at a minimum, defendant's failure to raise his salary and, later, his termination following his FMLA leave makes out a prima facie case of discrimination. (Id. at 13-14).

Since plaintiff only alleges that an adverse employment action was taken in response to his taking FMLA leave and only *after* he took leave, the Court does not find any basis for his interference claim. "Interfering with" the exercise of an employee's rights includes "for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004) (citing 29 C.F.R. § 825.220(c)). Plaintiff does not claim that defendant in any way discouraged him from taking leave or prohibited him from exercising his rights under the FMLA; he claims only that defendant punished him for exercising his rights under the FMLA. Thus, plaintiff asserts a

18

retaliation claim, not an interference claim.

### b. Plaintiff's Retaliation Claim

In the Fifth Cause of Action in his Complaint, plaintiff alleges that "[by] its discharge of plaintiff because he took medical leave, defendant violated plaintiff's rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*" (Compl. ¶ 30). However, in his Memorandum of Law opposing defendant's summary judgment motion, plaintiff appears to raise a new claim – namely, that his termination was not the only adverse employment action he suffered after taking FMLA leave. Now plaintiff seems to argue in his motion papers that defendant retaliated against him for taking FMLA leave by failing to consider him for or give him a raise in 2006 and 2007. (Pl.'s Opp. at 12). Defendant's failure to consider plaintiff for a raise or give him a raise following his FMLA leave may be considered as circumstantial evidence of retaliatory intent. However, because plaintiff failed to include the denial of a raise as a separate claim in his Complaint, plaintiff is precluded from arguing that defendant's failure to hold his review or give him a raise alone is sufficient proof of his Fifth Cause of Action. Accordingly, in considering the plaintiff's FMLA retaliation claim, the Court therefore has only considered plaintiff's "discharge" or termination as the adverse employment action alleged in this case. (Compl. ¶ 30).

In pursuing his claim of retaliation against defendant, plaintiff must not only establish that he exercised rights protected by the FMLA; he must also demonstrate that he was qualified for the position and that he suffered an adverse employment action under circumstances giving rise to an inference of retaliatory intent. While plaintiff contends that he was qualified for the

19

position and held it for several years without complaint, defendant has raised an issue as to whether the plaintiff's lack of clinical training and accreditations rendered him unqualified to perform certain functions of the job – namely, the screenings that were required prior to confirming a patient's admission to a HealthBridge facility. (Def.'s Mem. at 25). Defendant also contends that plaintiff has failed to show that his termination occurred under circumstances giving rise to an inference of discrimination. (Id.)

Under the McDonnel Douglas burden shifting test, defendant correctly notes that even if plaintiff can establish a prima facie case with respect to the first two prongs of the test and HealthBridge articulates a legitimate non-discriminatory explanation for his termination, plaintiff ultimately bears the burden of proving that HealthBridge's proffered reason was a pretext for retaliation. See Texas Dep't of County Affairs v. Burdine, 450 U.S. 248, 256 (1981). HealthBridge argues that the circumstances surrounding plaintiff's termination do not give rise to an inference of retaliatory intent because not only was plaintiff permitted to take leave, but he returned to his job with "the same salary, same duties and the same individuals reporting to him." (Def.'s Mem. at 25). In addition, plaintiff's employment was not terminated until roughly nine months after he returned from FMLA leave. (Id. at 24). Defendant argues that in order for plaintiff to prove retaliatory intent based on "mere temporal proximity" between the FMLA leave and the adverse employment action, plaintiff must demonstrate that the temporal proximity was "very close." (Def.'s Mem. at 24 (quoting Walder v. White Plains Bd. of Educ., 738 F. Supp. 483, 503 (S.D.N.Y. 2010) (internal citations omitted))).

While the FMLA was not intended to shield employees from all legitimate business

20

decisions that result in negative consequences to their employment such as the elimination of the position here, see Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004); see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F. 3d at 161, plaintiff argues that defendant has failed to explain why plaintiff was not given a raise in 2006 and 2007, prior to the decision to downsize. (Pl.'s Opp. at 14). Indeed, the caselaw makes it clear that to sustain a claim under FMLA, a plaintiff need only show that discrimination was a motivating factor in the decision, even if defendant's proffered explanation is also credible. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003); Fields v. N.Y.S. Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997). Plaintiff has asserted a number of facts that suggest that the explanation advanced by defendant is a pretext for discrimination. (See discussion supra at 13-14).

Specifically, plaintiff points to the fact that he was the highest producer in his group and successfully supervised the other sales people in his region. In addition, as noted above, plaintiff had operated successfully for years without the need for the licenses now being claimed as critical to his job performance and there is a dispute as to plaintiff's ability to do screenings. More importantly, plaintiff argues that his lack of licensing is pretextual because Ms. Leja, who made the decision to recommend him for termination, was not even aware of plaintiff's qualifications. Finally, particularly pertinent to his FMLA claim, plaintiff points to the note that states: "January 20 back from leave, . . . ." All of these facts, taken together, could, if proved credible, support a finding of pretext.

Accordingly, having considered all of the facts proffered by both parties, the Court finds

21

that plaintiff has raised issues of fact regarding the articulated reason for defendant's discharge of plaintiff following his return from FMLA leave that preclude summary judgment on this claim.

### C. Plaintiff's Claim Under the NYSHRL

Defendant moves for summary judgment on plaintiff's claim of disability discrimination brought under the NYSHRL,[10] arguing that plaintiff cannot establish a prima facie showing that he was regarded as disabled by defendant.

#### 1) Standards

Disability discrimination claims under the NYSHRL "are governed by the same legal standards as such claims under the ADA." Reddick v. Niagara Mohawk Power Co., No. 08 CV 0995, 2010 WL 5185098, at *3 n. 8 (N.D.N.Y. Dec. 16, 2010). In order to state a prima facie case of disability discrimination under the NYSHRL, plaintiff must establish that: (1) HealthBridge is covered by the relevant statute, (2) plaintiff is disabled within the meaning of the statute, (3) plaintiff is able to perform the essential functions of his position with or without a reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability. See Fowler v. Kohl's Dept. Stores, Inc., No. 07 CV 1197, 2009 WL 2155481, at *4 (N.D.N.Y. July 16, 2009). Once a plaintiff makes out this prima facie case under the NYSHRL, "a rebuttable presumption of discrimination arises. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." Attis v. Solow Realty Development Co., 522 F. Supp. 2d 623, 627 (S.D.N.Y. 2007). "If the employer

---

[10]As noted supra at n.2, plaintiff has withdrawn his claim under the ADA.

22

articulates such a reason, the presumption of discrimination "simply drops out of the picture," and the burden shifts back to the plaintiff to show, without the benefit of any presumption, that, more likely than not, discrimination was a motivating factor in the employer's adverse decision." Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).

Plaintiff correctly points out that there are some differences between the ADA and the NYSHRL. Thus, "[w]hile disability discrimination claims under the ADA and the [NYSHRL], N.Y. Exec. Law § 296, et seq. . . . are analyzed similarly, the definition of disability is broader under the NYSHRL." Levine v. Smithtown Cent. School Dist., 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008). The NYSHRL defines "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . ." N.Y. Exec. Law § 292(21) (McKinney's 2010). New York's definition is broader than most other disability statutes, including the ADA. See Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 154 (2d Cir. 1998) (citing State Division of Human Rights v. Xerox Corp., 65 N.Y.2d 213, 218, 491 N.Y.S.2d 106, 109 (1985)). The NYSHRL "provides that disabilities are not limited to physical or mental impairments, but may also include 'medical' impairments." State Division of Human Rights v. Xerox Corp., 65 N.Y.2d at 218-19, 491 N.Y.S.2d at 109. In addition, unlike the ADA, the NYSHRL "does not impose the requirement that the impairment substantially limit the individual's normal activities." Krikelis v. Vassar College, 581 F. Supp. 2d 476, 486 (S.D.N.Y. 2008). Aside from the law's unique definition of "disability," claims under the NYSHRL are

23

analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas. See Reeves v. Johnson Controls World Services, Inc., 140 F.3d at 156 n. 9.

### 2) Analysis

Plaintiff alleges that he is disabled within the meaning of the NYSHRL based on his diabetes. He claims that defendant knew of his diabetes and expected that his diabetes might cause additional absences. (Compl. ¶¶ 11, 14). Plaintiff claims that he was ultimately discharged because of his disability. (Id. ¶ 26). Defendant argues that plaintiff cannot make a prima facie showing that HealthBridge "regarded him as disabled under the NYSHRL." (Def.'s Mem. at 18).

There appears to be no dispute that HealthBridge is covered by the NYSHRL. However, based on the NYSHRL's broader definition of "disability," the Court finds that a triable issue of fact has been raised regarding whether plaintiff's diabetes constitutes a disability under the NYSHRL. See Epstein v. Kalvin-Miller Intern., Inc., 100 F. Supp. 2d 222, 230 (S.D.N.Y. 2000) (holding that plaintiff's type 2 diabetes and heart disease, which were diagnosed by a licensed physician, were medical disabilities within the meaning of the NYSHRL); Krikelis v. Vassar College, 581 F. Supp. 2d at 486 (finding a triable issue of fact existed regarding whether plaintiff's diabetes is a cognizable disability under the NYSHRL).

Defendant claims that plaintiff did not require an accommodation relating to his diabetic condition (Def.'s 56.1 Stmnt ¶ 41), yet plaintiff and defendant are in agreement that plaintiff tested his blood four times a day, and did so in his car during the workday when he was working for HealthBridge. (Def.'s 56.1 Stmnt ¶ 43; Pl.'s Resp. ¶ 43). There also seems to be no dispute

24

that plaintiff's heart surgery was related to his medical condition. Finally, it is undisputed that plaintiff's termination constitutes an adverse employment action.

Assuming for purposes of this motion that plaintiff can establish that his diabetes qualifies as a disability under the NYSHRL, he must still show that he suffered the adverse employment action because of his disability. As with plaintiff's other claims, defendant has argued that there was a legitimate, non-discriminatory reason for plaintiff's termination.

Plaintiff has asserted a number of facts that suggest that this explanation advanced by defendant is a pretext for discrimination. (See discussion supra at 13-14). Although the evidence supporting plaintiff's claim that his diabetes was the real reason for the termination is not as substantial as perhaps some of his other claims, he has asserted that his heart surgery was required as a result of his diabetes. Thus, if the jury were to find that his diabetes was a disability under the NYSHRL, and plaintiff could demonstrate through the note that specifically referred to him as "diabetic," that his condition was a motivating factor behind his termination, he may be able to demonstrate pretext.

Accordingly, having considered all of the facts proffered by both parties, the Court finds that plaintiff has raised sufficient issues of fact regarding the articulated reason for defendant's discharge of plaintiff that preclude summary judgment on this claim.


## II. Plaintiff's Retaliation Claims and Defendant's Counterclaim

On or about February 2, 2009, following the filing of the Complaint, defendant allegedly discovered that plaintiff had been maintaining certain confidential HealthBridge information on

plaintiff's home computer in violation of company policy. (Def.'s 56.1 Stmnt ¶ 64). On April 23, 2009, defendant moved to amend its Answer to include counterclaims alleging breach of fiduciary duty and spoliation of evidence. By Order dated July 9, 2010, the district court adopted this Court's Report and Recommendation and granted defendant's request for permission to amend the Answer to assert a counterclaim alleging that plaintiff had breached his fiduciary duty. The district court, however, denied defendant's request to add a claim of spoliation in the Complaint, holding that such a claim was not cognizable under New York law. However, this Court did impose costs and attorney's fees on plaintiff, finding that Rule 37 of the Federal Rules of Civil Procedure provided an adequate remedy for spoliation.

In response, plaintiff amended his Complaint to add a claim of retaliation, alleging that defendant only sought spoliation sanctions in retaliation for plaintiff pursuing his discrimination claims.

Plaintiff now moves for summary judgment on defendant's counterclaim for breach of fiduciary duty and defendant cross-moves for summary judgment on plaintiff's retaliation claims. For the reasons stated below, both motions are denied.

A. Factual Background

In connection with defendant's counterclaim for breach of fiduciary duty, plaintiff concedes that it is undisputed that he worked on his home computer and that defendant was aware of this fact. (Pl.'s Cntrclm 56.1 Stmnt[11] ¶ 1). Plaintiff alleges in his Complaint that

---

[11]Citations to "Pl.'s Cntrclm 56.1 Stmnt" refer to Plaintiff Marc Penberg's Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1, filed June 27, 2011.

because he did not have an office in his sales territory, he used his home as his office. (Compl. ¶ 8). Plaintiff claims that he would "prepare certain documents on [his] computer" and fax them to his supervisors at HealthBridge. (Penberg Decl.[12] ¶ 6). Among the documents that he concedes were maintained on his home computer were patient assessments, personnel evaluations of his subordinates, and sales reports, among other things. (Id. ¶ 5). Plaintiff claims that he chose to use his personal computer rather than the company laptop which was issued to him because he preferred Apple computers. (Penberg Decl. ¶¶ 3-4; O'Brien Aff. 4/22[13] ¶ 5).

Although HealthBridge admits that it became aware that plaintiff performed work on his home computer, defendant denies being aware of this fact until after this litigation began. (Def.'s Resp.[14] ¶ 1). Defendant asserts that HealthBridge has a policy that employees not disclose HealthBridge's confidential or proprietary information to the public and requires all former employees to return company property to HealthBridge at the time of separation. (Def.'s 56.1 Stmnt ¶¶ 52, 53). Defendant contends that this policy requires the return of all originals and copies of any confidential and/or proprietary information; indeed, the Separation Agreement contained a specific provision requiring that plaintiff not disclose confidential or proprietary information, including patient or employee information, and marketing plans or projections. (Id.

---

[12]Citations to "Penberg Decl." refer to the Declaration of Marc Penberg, filed on June 3, 2009.

[13]Citations to "O'Brien Aff. 4/22" refer to the Affidavit of Jennifer M. O'Brien, Esq., dated April 22, 2009 and submitted in support of HealthBridge's Motion to Dismiss.

[14]Citations to "Def.'s Resp." refer to the Defendant's Response to Plaintiff's Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1, dated July 18, 2011.

¶ 55; Moran Decl.,[15] Ex. F). Defendant also contends that the Separation Agreement contained a provision requiring the return of all company property and prohibiting plaintiff from accessing any company property. (Def.'s 56.1 Stmnt ¶ 57; Moran Decl., Ex. F). Plaintiff concedes that there is a policy that former employees not disclose confidential information, but disputes the statement regarding the return of company property, asserting that the employees are not advised of this policy. (Pl.'s Resp. ¶¶ 52, 55). Plaintiff further asserts that he refused to agree to the terms of the Separation Agreement. (Id. ¶ 57).

Defendant alleges that after his termination, plaintiff maintained confidential data relating to HealthBridge residents and prospective residents on his personal computer, that the computer was accessible by third parties, and that the information was not password protected. (Def.'s 56.1 Stmnt ¶¶ 60, 61). Defendant further contends that while plaintiff continued to maintain possession of this confidential information, he connected his computers to the internet, using LimeWire, a file sharing program, thus allowing third parties to have access to this confidential information. (Id. ¶¶ 62, 63). Plaintiff claims that he never revealed any proprietary information to anyone other than his attorney, and never emailed any patient or HealthBridge information to anyone. (Pl.'s Cntrclm 56.1 Stmnt ¶ 2). Similarly, although he admits that his son installed LimeWire on his home computer, he claims that he was told by a HealthBridge expert in March 2009 that there was "no way that any files in his computer were attached and 'leaked' out into the internet using Limewire." (Id. ¶ 3).

---

[15]Citations to "Moran Decl." refer to the Declaration of Sandra S. Moran, Esq., dated July 18, 2011.

Defendant contends that it did not learn of plaintiff's failure to return the company's confidential information until on or about February 2, 2009; at that time, the defendant demanded the immediate return of the documents in both electronic and hard copy format. (Id. ¶¶ 64, 65). Despite reminding plaintiff of his duty to preserve this information, defendant claims that plaintiff confirmed on April 8, 2009, that he had destroyed the files, data and other documents that he had previously stored on his computer. (Id. ¶¶ 66, 70).

Plaintiff admits that he destroyed the documents as alleged (id. ¶¶ 61, 70), but he denies that the destruction of these documents resulted in a loss of evidence relevant to the defenses of HealthBridge or that it made it difficult for the company to notify individuals of potential breaches of their personal health information. (Id. ¶ 71; but see Def.'s 56.1 Stmnt ¶ 71).

## B. Plaintiff's Motion for Summary Judgment on the Counterclaim

Turning first to plaintiff's cross-motion for summary judgment, plaintiff asserts that defendant's counterclaim for breach of fiduciary duty should be dismissed because defendant cannot demonstrate that plaintiff breached a fiduciary duty owed to defendant nor can defendant establish that if suffered any damages as a result of plaintiff's conduct that has not already been awarded by the Court pursuant to Fed. R. Civ. P. 37.

### 1) Standards

"In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." Kurtzman v. Bergstol, 40 A.D.3d 588, 590, 835 N.Y.S.2d 644, 646

29

(2d Dep't 2007) (internal citations omitted).

### 2) Analysis

HealthBridge contends that plaintiff breached his fiduciary duty in three ways: 1) by maintaining confidential Healthbridge documents on his home computer and by continuing to maintain the documents and materials in hard copy and electronic format contrary to HealthBridge's established policy that employees are required to return the information to the company upon termination of their employment; 2) by allowing the information to be leaked to the public through the internet; and 3) by filing papers on ECF without proper redaction (Def.'s Opp.[16] at 11-12).

As an initial matter, plaintiff does not appear to dispute the fact that he owed a fiduciary duty to HealthBridge not to disclose confidential Company documents, including sensitive patient healthcare information, which he was required to maintain as confidential under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). (Id. at 11). HealthBridge contends that even in the absence of a specific contract or agreement, "'[t]he duty of an employee not to use or divulge confidential knowledge acquired during his employment is implicit in the employer-employee relation [and] is an absolute, and not relative, duty.'" Abraham Zion Corp. v. Lebow, 593 F. Supp. 551, 569 (S.D.N.Y. 1984), aff'd, 761 F.2d 93 (2d Cir. 1985). Plaintiff has conceded that he was aware of his obligation to keep the HealthBridge patient information confidential. (Pl.'s Cntrclm 56.1 Stmnt ¶ 2). Thus, there does not appear to

---

[16]Citations to "Def.'s Opp." refer to Defendant HealthBridge's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, filed July 18, 2011

be any dispute that plaintiff owed a fiduciary duty to HealthBridge to maintain the confidentiality of Company records.

### a. Failure to Return HealthBridge Documents

With respect to the claim that plaintiff breached his fiduciary duty by possessing these documents and retaining them after the termination of his employment, HealthBridge argues that not only was plaintiff aware of his obligations under HealthBridge's confidentiality policy and under HIPAA, but he confirmed in writing that he had read the Separation Agreement which contained these very nondisclosure provisions, along with a specific provision requiring the return of Company property. Plaintiff, however, denies that he read the entire Separation Agreement and insists that, in any event, he did not agree to its terms. (Penberg Decl. ¶ 8). Plaintiff claims that he did not receive the Agreement until "[s]everal days" after he was terminated (id. ¶ 9(b), Exs. 1-3), and that when the Separation Agreement revealed that he was to receive only four months of severance, he did not read any further because this amount was unacceptable to him.[17] (Id. ¶ 9(c)). As a result, plaintiff contends that he is not bound by the Agreement, including its non-disclosure clause, because he did not accept the money being offered. (Id. (further noting that "[n]othing in paragraph 8 of the Separation Agreement was ever given or stated to me while I was employed")).

Moreover, plaintiff contends that not only was HealthBridge fully aware of the fact that plaintiff used his home computer for work, he further affirms that upon his termination in 2007,

---

[17]Defendant notes that on August 19, 2007, plaintiff confirmed in writing that he had read the Separation Agreement and General Release, which set forth these confidentiality obligations. (Def.'s Mem. at 6; O'Brien Aff. 4/22 ¶ 8, Ex. B).

"no one said anything about an obligation to return papers." (Id. ¶ 9). Indeed, he contends that defendant has not presented any evidence to demonstrate that defendant had a document retention policy or that plaintiff was ever informed of a policy that required the return of documents stored on his computer. (Id. ¶ 8).

In the absence of any evidence detailing the Company's retention policy and demonstrating that the retention policy was ever provided to plaintiff prior to his termination, and given the factual dispute as to defendant's knowledge of the use of plaintiff's home computer and the extent to which he read the entire Separation Agreement, the Court finds that there are issues of fact in dispute as to what HealthBridge's policy was and whether plaintiff breached his fiduciary duty by not returning HealthBridge documents following his termination.

### b. Internet Leak

HealthBridge's second basis for alleging a breach of fiduciary duty is based on the assertion that confidential HealthBridge documents were leaked onto the internet through a file-sharing program, LimeWire, that was installed on plaintiff's home computer. In support of this argument, HealthBridge contends that it has obtained an opinion from an independent computer forensics expert who has opined that certain confidential HealthBridge information was leaked from plaintiff's home computer onto the internet. (Def.'s Opp. at 12). The expert also allegedly confirmed that plaintiff deleted or destroyed certain documents which had been maintained on his computer in violation of company policy.

Plaintiff denies the claim that confidential information was leaked onto the internet in breach of his fiduciary duty. He contends that a HealthBridge employee informed him that

32

despite the claim that the documents had been leaked through LimeWire, the employee allegedly looked at the program before deleting it and determined that "it did not show that it had exported any of plaintiff's HealthBridge files." (Penberg Decl. ¶ 42). Furthermore, plaintiff challenges the admissibility of the evidence that defendant has proffered in support of the claim that information was leaked onto the internet. Specifically, plaintiff contends that the only evidence presented by defendant is an email from Rian Wroblewski of the "Red Team." (Pl.'s Reply[18] at 2). Mr. Wroblewski's testimony with respect to what was found by the Red Team is not available because he has failed to comply with Court orders to appear for deposition. Therefore, plaintiff contends that Wroblewski's email is inadmissable hearsay under the Federal Rules of Evidence. (Id.)

Defendant argues that the Red Team email is admissible under the state of mind hearsay exception and the business records hearsay exception to the hearsay rule. (Def.'s Opp. at 14). The email at issue is entitled "[SPAM] HealthBridge P2P Exposure," and it reads as follows: "Attached you will find a screen capture with IP address and total files shared, in addition to a txt [sic] file containing the titles of all files in the shared folder. I am also attaching a few sample documents." (Moran Decl., Ex. K). This email and attachments were received after counsel for defendant had a conversation with Mr. Wroblewski. (O'Brien Aff. 4/22 ¶ 11).

Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for:

> A memorandum, report, record, or data compilation in any form, of acts [or] events . . . made at or near the time by, or from information transmitted by, a person with knowledge,

_____

[18]Citations to "Pl.'s Reply" refer to the letter reply submitted by plaintiff, dated July 26, 2011.

33

> if kept in the regular course of a regularly conducted business
> activity, and if it was the regular practice of that business
> activity to make the memorandum, report, record, or data
> compilation, all as shown by the testimony of the custodian
> or other qualified witness, unless the source of the
> information or the method or circumstances of preparation
> indicate lack of trustworthiness.

According to the Second Circuit, "admissibility under Rule 803(6) requires both that a

memorandum have been 'kept in the course of a regularly conducted business activity' and also

that it was the 'regular practice of that business activity to make the memorandum . . . .'" United

States v. Freidin, 849 F.2d 716, 719-20 (2d Cir. 1988) (quoting Rule 803(6)). These two

elements "must be shown by the 'testimony of the custodian or other qualified witness' of the

record. Finally, even if it meets these requirements, the memorandum cannot be admitted if the

'source of information or the method or circumstances of preparation indicate lack of

trustworthiness.'" Id. See also Phoenix Assoc. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995).

"Courts have held that conventional letters, memos, or notes are admissible under the

business records exception if they are regularly made in furtherance of the employer's needs and

not for the personal purposes of the employee who made them." Canatxx Gas Storage Ltd. v.

Silverhawk Capital Partners, LLC, Civil Action No. H-06-1330, 2008 WL 1999234, at *12

(S.D.Tex. May 8, 2008).

> Courts have applied a similar approach to emails. A party
> seeking to introduce an email made by an employee about
> a business matter under the hearsay exception under Rule
> 803(6) must show that the employer imposed a business duty
> to make and maintain such a record. Courts examine whether
> it was the business duty of an employee to make and maintain
> emails as part of his job duties and whether the employee
> routinely sent or received and maintained the emails.

Id. In determining whether an email constituted a business record, the court in Canatxx reviewed

34

an affidavit from the principal of the company stating that an email he had prepared recounting his phone conversation directing defendant to stop work on a deal was a document made in the course of the company's regular business activity. That representation, coupled with the statement that it was the company's regular practice to keep these records, was found by the court to satisfy Rule 803(6). Id. at *13. See also DirectTV, Inc. v. Murray, 307 F. Supp. 2d 764, 772-73 (D.S.C. 2004) (admitting email sales records when orders were routinely placed via email and the emails were retained as business records); Pigre v. RBC Liberty Life Ins., Civil Action No. 05-1042-C, 2007 WL 2071829, at *2 (M.D. La. July 13, 2007) (finding that emails fell within Rule 803(6) because they were prepared by employees "during the ordinary course of business"); but cf., New York v. Microsoft, No. CIV A. 98-1233(CKK), 2002 WL 649951, at *2 (D.D.C. Apr. 12, 2002) (refusing to admit emails under the business records hearsay exception due to a "complete lack of information regarding the practice of composition and maintenance of" the emails); United States v. Ferber, 966 F. Supp. 90, 98 (D. Mass. 1997) (finding that emails submitted by the government did not fall under the business records exception because there was not sufficient evidence that [the employer] required such records to be maintained").

Although in this case, the person actually preparing the email, Mr. Wroblewski, has not testified regarding the preparation of the email, defendant contends that the Second Circuit has taken a liberal approach to the admissibility of business records. (Def.'s Opp. at 16-17). Citing The Retirement Plan of the Unite Here Nat'l Retirement Fund v. Kombassan Holding, A.S., 629 F.3d 282, 289 (2d Cir. 2010), defendant claims that there is no requirement that the person who

35

actually created the record testify, so long as it is the regular practice of the business entity to receive information from that person. (Def.'s Mem. at 16-17 (citing id.)). See also In re Enron Creditors Recovery Corp., 378 B.R. 54, 57-58 (S.D.N.Y. 2007). Defendant asserts that the testimony of Anthony Sturniolo, CEO of Tony Joseph and Sons Investigation, of which Red Team Protection is a division, supports the defendant's claim that this email is admissible as a business record. (Def.'s Opp. at 17). Specifically, Mr. Sturniolo testified that Mr. Wroblewski handled the Red Team in February 2009, at or near the time the email was sent, and that part of Mr. Wroblewski's job was to perform internet searches to obtain confidential information about companies and individuals. (Moran Decl., Ex. L (Sturniolo Dep. at 14)). Mr. Sturniolo further testified that as part of this responsibility, Mr. Wroblewski would notify the affected company or individual about the information discovered. (Id.) Sturniolo also testified that the information Wroblewski obtained regarding HealthBridge contained in the email was of the sort he would bring to Sturniolo's attention, though Sturniolo could not specifically recall having a conversation with Wroblewski about what he had found in this case. (Id. at 19-20, 25).

Plaintiff argues that Mr. Sturniolo's testimony does not lay the foundation necessary to support the business record exception because Mr. Sturniolo could not say whether Exhibit K was the email Mr. Wroblewski sent or that the email address in Exhibit K is the address from which Mr. Wroblewski conducted his business. (Pl.'s Reply at 3-6). However, on redirect, Mr. Sturniolo confirmed that the email address listed in Exhibit K was in fact the email address from which Mr. Wroblewski conducted his business for Red Team Protection. (Moran Decl., Ex. L

36

(Sturniolo Dep. at 20-21)). According to Mr. Sturniolo, Mr. Wroblewski worked off of his personal computer, rather than a computer provided by Red Team Protection. (Id. at 4).

In addition, plaintiff argues that Sturniolo did not recall if the information found by Wroblewski had been described to him and that he had not seen any of the specific documents and did not recall having any conversations with Mr. Wroblewski regarding HealthBridge after directing him to send the email. (Id. at 4-5).

Upon consideration of Mr. Sturniolo's deposition testimony, the Court finds that Mr. Sturniolo's testimony is sufficient to lay the foundation for introduction of the email as a business record for purposes of this motion. Sturniolo indicated that it was the regular business practice of Red Team Protection for Mr. Wroblewski to share the type of information contained in the email with Sturniolo and that it was their regular business practice and Mr. Wroblewski's duty to email clients with information such as that included in the email, Exhibit K. Given that the email will likely be admissible at trial, it raises enough issues of fact regarding whether plaintiff leaked confidential information on the internet to render summary judgment inappropriate at this stage.

### c. ECF Filings

In addition to the leak of information onto the internet, HealthBridge contends that plaintiff has breached his fiduciary duty by electronically filing papers on ECF without proper redaction of certain sensitive and confidential information, including dates of birth, social security numbers, home addresses, Medicaid and Medicare numbers of potential HealthBridge

37

residents. (Def.'s Opp. at 7). He has also allegedly filed evaluations of his colleagues which contained their social security numbers and salary information. (Id.)

The Court views plaintiff's filing of confidential information on ECF as it views the alleged internet leak of confidential information: both instances could provide a basis for defendant's breach of fiduciary duty claim. Therefore, plaintiff has failed to show that there is no issue of fact on the first two prongs of the breach of fiduciary duty claim to render summary judgment appropriate here.[19]

### d. Failure to Show Damage

Even if defendant can establish a breach of fiduciary duty, plaintiff argues that defendant is unable to establish that it was damaged in any way by this conduct. Plaintiff affirms that he "never used [his] HealthBridge contacts in an effort to find myself new work." (Penberg Decl. ¶ 10). In fact, plaintiff contends that he never looked at any HealthBridge document he has in his possession until after his deposition in December 2008. (Id. ¶ 9(c)). He did not print out what he has on his computer "since defendant already had every document on my computer." (Id. ¶ 10). At plaintiff's deposition, plaintiff recalls that he agreed to print out documents on his computer to be forwarded by his attorney to defendant. (Id. ¶ 11, Ex. 4).

HealthBridge argues that it was damaged in that it incurred "tens of thousands of dollars in expert and attorneys' fees as a direct result of Plaintiff's breach of his fiduciary duty." (Def.'s

---

[19]The Court addressed the immediate concerns posed by plaintiff's filing of confidential information on ECF in its October 12, 2011 Sealing Order.

38

Opp. at 13). Although defendant concedes that the Court has already awarded a portion of counsel's and the expert's fees as a spoliation sanction, HealthBridge contends that it is entitled to recover "its full measure of compensatory damages, even if each claim presents an alternative theory of liability based upon the same set of facts, the same series of acts, and the same injuries caused by Plaintiff." (Id. (citing Bingham v. Zolt, 66 F.3d 553, 564 (2d Cir. 1995))).

Plaintiff argues that defendant's expenditures throughout the course of this case were not "proximately caused by plaintiff's 'leak' of documents onto the internet." (Pl.'s Reply at 2). However, HealthBridge further argues that it is entitled to pursue its claim even if the fact finder determines that defendant should receive only nominal damages. (Id.) In support of this claim, defendant cites Brian E. Weiss, D.D.S., P.C. v. Miller, where the court upheld an award for nominal damages where breach of fiduciary duty was found. 166 A.D.2d 283, 564 N.Y.S.2d 110, 111 (1st Dep't 1990). In Miller, the court considered whether an award of nominal damages would be sustained where the plaintiff established that defendant had committed a breach of fiduciary duty and engaged in unfair competition but was unable to prove actual damages or a substantial loss. 166 A.D.2d at 283, 564 N.Y.S.2d at 111. Although the Miller court concluded that the lower court's award of actual damages was not supported by the evidence, the court nevertheless held that "nominal damages will be awarded to a plaintiff where the law recognizes a technical invasion of his right or a breach of defendant's duty, but where the plaintiff has failed to prove actual damages or a substantial loss or injury to be compensated." Id. at 283, 564 N.Y.S.2d at 111.

39

Plaintiff correctly notes that the holding in Miller is contrary to the weight of New York authority. In Kronos v. AVX Corp., the Court of Appeals noted that while "[n]ominal damages are always available in breach of contract actions, . . . they are allowed in tort only when needed to protect an 'important technical right.' For example, nominal damages have been recognized in tort to protect a landowner's right to be free of trespass . . . because a continuing trespass may ripen into a prescriptive right and deprive a property owner of title to his or her land." 81 N.Y.2d 90, 95, 612 N.E.2d 289, 595 N.Y.S.2d 931 (1993). "A 'claim of breach of fiduciary duty . . . is a tort claim.'" Connecticut Student Loan Foundation v. Enterprise Recovery Systems, Inc., No. 3: 04-CV-00712, 2011 WL 1363772, at *3 (D. Conn. April 11, 2011). Thus, absent some limited exception, nominal damages would not normally be available. Indeed, the Second Circuit, citing Kronos, noted that "no such exception is warranted for . . . [a] breach of fiduciary duty . . . claim . . . [because it does not] involve[] the type of 'important technical right[s]' noted in Kronos." Action House, Inc. v. Koolik, 54 F.3d 1009, 1019 (2d Cir. 1995).

If defendant were seeking only nominal damages for plaintiff's alleged breach of fiduciary duty, the Court would find summary judgment on defendant's counterclaim appropriate at this time. However, in the counterclaim, defendant seeks "compensatory damages" as well as attorneys' fees and costs above and beyond those which were, in part, awarded in connection with the spoliation motion. Accordingly, the Court denies plaintiff's motion for summary judgment on defendant's counterclaim without prejudice to renew if defendant is unable to submit proof at trial of actual damages resulting from plaintiff's alleged breach.

40

C. Defendant's Motion for Summary Judgment on Plaintiff's Retaliation Claim

Plaintiff's amended Complaint alleges that defendant's motion seeking to impose spoliation sanctions on plaintiff constitutes retaliation for plaintiff's continued pursuit of his discrimination claims. Defendant moves for summary judgment seeking to dismiss plaintiff's retaliation claim on the grounds that plaintiff is unable to state a prima facie case.

### 1) Standards

In order to establish a prima facie case of retaliation under the various discrimination statutes that form the basis for plaintiff's Complaint – the ADEA, the FMLA, or the NYSHRL – plaintiff must show: 1) that he participated in a protected activity known to the defendant; 2) that an adverse employment action was taken, disadvantaging plaintiff; and 3) that there is a causal connection between the protected activity and the adverse employment action. See Amar v. Hillcrest Jewish Ctr., No. 05 CV 3290, 2009 WL 891795, at *6 (E.D.N.Y. Mar. 31, 2009) (citing Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004)); see also Quinn v. Green Tree Credit Corp., 159 F.3d at 768-69; Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996); Ortiz v. Trustees of Columbia Univ., No. 96 CV 3018, 1999 WL 126448, at *6 (S.D.N.Y. Mar. 9, 1999). Since retaliation claims are governed by the three-step burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. at 802-03, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to point to evidence that there was a legitimate, non-discriminatory reason for the adverse employment action. If the defendant meets this burden, plaintiff must then demonstrate that the proffered legitimate reason was merely a

41

pretext for impermissible retaliation. See, e.g., Quinn v. Green Tree Credit Corp., 159 F.3d at 768-69; Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995). The purpose of the anti-retaliation provision is "obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

In establishing the first element, plaintiff does not need to show that the conduct which he objected to was in fact discriminatory conduct in violation of the ADEA, FMLA or the NYHRL; he must, however, have "'a good faith, reasonable belief that the underlying employment practice was unlawful' under [these statutes]." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d at 1178); see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d at 593. To the extent that an employee complains about perceived "unfair" treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to his protected status, he fails to establish that he was engaged in protected activity. Velasquez v. Goldwater Memorial Hosp., 88 F. Supp. 2d 257, 264 (S.D.N.Y. 2000) (holding that general complaints about corporate policy without linking it to plaintiff's status are insufficient to establish "protected activity" under Title VII); see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 126 F.3d 276 (holding that general complaints about job responsibility did not constitute protected activity where there was no evidence of discrimination); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d at 593 (holding that general

42

complaints about hiring practices were not "protected activity"). "[I]n order to be protected activity[,] the complainant must put the employer on notice that the complainant believes that discrimination is occurring." Ramos v. City of New York, No. 96 CV 3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997).

## 2) Analysis

Defendant does not appear to dispute that plaintiff engaged in protected activity by filing and pursuing the instant lawsuit. Hernandez v. Jackson, Lewis, Schnitzler & Krupman, 997 F. Supp. 412, 418 (S.D.N.Y. 1998) (holding that "protected activity typically consists of filing a lawsuit or a formal complaint with an agency . . . "); see also Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 65 (2d Cir. 1992). Nor does defendant appear to disagree with plaintiff's assertion that he experienced an adverse impact as a result of defendant's assertion of a breach of fiduciary duty claim and its motion for sanctions. Indeed, the Supreme Court has made it clear that in order to show an adverse impact, plaintiffs are not confined to those harms that are related to the workplace or employment. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. at 57. Instead, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 68. The Court explained that any hardship imposed by an employer that could reasonably motivate an "employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint [to] choose the former," would qualify as retaliatory. Id. at 73. In other words, the employer cannot impose consequences on a worker for

43

filing a discrimination charge in order to deter him or her from pursuing a claim.

Instead, defendant focuses on the second phase of the McDonnel Douglas test and argues that HealthBridge had legitimate reasons for filing its counterclaim for breach of fiduciary duty and for pursuing sanctions for the destruction of the evidence contained in plaintiff's computer. (Def.'s Mem. at 26). HealthBridge argues that plaintiff knew he had a duty to protect the company's proprietary and confidential information under HIPAA. (Id.) It further asserts that plaintiff read and understood the Separation Agreement, which required him not to disclose or share any HealthBridge information with anyone. (Id.) Despite this knowledge, plaintiff maintained this information on a home computer that was not password protected and that was accessible by third parties. (Id.) Defendant claims that by connecting to the internet through the use of a file-sharing program, plaintiff breached his fiduciary duty to HealthBridge by allowing others to obtain confidential information. (Id.) Moreover, defendant contends that plaintiff's destruction of the files after the discovery of this breach and after specific warnings from defendants was intentional and clearly provided a justification for defendant to seek sanctions for the spoliation. (Id. at 27).

In response to defendant's motion, plaintiff argues that he need only show that a "reasonable employee would have found the challenged action adverse and might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Pl.'s Opp. at 16). While plaintiff concedes that HealthBridge has a policy that former employees not disclose its confidential information to the public and that he understood his obligation to

44

maintain the confidentiality of information under HIPAA (Pl.'s Resp. ¶ 53, 58, 59), he claims that HealthBridge never asked him to return the documents. (Pl.'s Opp. at 17). He further claims that HealthBridge never brought any claims against him until he "presented evidence . . . which undercut the company's defense that plaintiff was chosen for layoff because he did not have the ability or the skill-set to do patient evaluations." (Id.) He contends that there is a "serious question" as to whether any of the documents were actually leaked and that even though defendant knew that plaintiff had company documents on his home computer, the company did nothing about it until plaintiff presented evidence favorable to plaintiff's claims in this case. (Id.) Accordingly, plaintiff argues that by taking action when it did, HealthBridge was retaliating against plaintiff in an effort to dissuade him from continuing to pursue his case. (Id.)

Although Healthbridge has proffered a legitimate non-retaliatory reason for seeking sanctions for the alleged loss of materials improperly stored on the plaintiff's home computer, there are numerous issues of fact that preclude summary judgment at this point. First, the parties dispute the extent of defendant's knowledge with respect to plaintiff's practice of using his home computer to store work-related documents; the parties dispute whether plaintiff was ever informed of the Company policy to return documents. There is also a dispute as to whether documents were ever actually leaked onto the internet; and, to the extent that documents were destroyed after the alleged discovery of the leak, whether those documents were, as plaintiff claims, merely duplicative of documents already in defendant's possession, thus mitigating any injury as far as the spoliation of evidence is concerned. Given these issues and considering the

timing of defendant's counterclaim and related demands on plaintiff, the Court finds that plaintiff has raised a triable issue of fact regarding whether defendant added its counterclaim with retaliatory intent. Therefore, the Court finds it improper to dispose of this claim on defendant's motion for summary judgment.

## CONCLUSION

Accordingly, defendant's motion for summary judgment is granted as to plaintiff's interference claim under the FMLA and denied as to all of plaintiff's other claims under the ADEA, FMLA, and NYSHRL and his retaliation claims. The Court also denies plaintiff's motion for summary judgment as to defendant's breach of fiduciary duty claim. The clerk is directed to send copies of this Memorandum and Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      October 17, 2011

/s/
_____

Cheryl L. Pollak
United States Magistrate Judge